IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VISUAL CONNECTIONS, INC., :
   Plaintiff/Counterclaim Defendant, :
:
v. : Civil Action No. 11-1307-RGA
:
MEDPRO SAFETY PRODUCTS, INC., :
   Defendant/Counterclaim Plaintiff :

---

S. Mark Hurd, Esq., and Karl G. Randall, Esq., Wilmington, Delaware; Jennifer Metzger Stinnett, Esq., and Christine A. Sebourn, Esq., Louisville, Kentucky, Attorneys for Plaintiff.

Elizabeth A. Sloan, Esq., Wilmington, Delaware; Earl M. Forte, Esq., Philadelphia, Pennsylvania; and Barry D. Hunter, Esq., Lexington, Kentucky, Attorneys for Defendant.

MEMORANDUM OPINION

May _, 2012

1

ANDREWS, U.S. DISTRICT JUDGE:

Before the Court are the parties' cross-motions for partial judgment on the pleadings (D.I. 20, 23), supporting memoranda (D.I. 21, 24), and reply briefs (D.I. 25, 26). For the reasons discussed, Visual Connections, Inc.'s motion is denied and MedPro Safety Products, Inc.'s motion is granted.

## BACKGROUND

VCI and MedPro entered into a technology transfer agreement in 2004 regarding VCI's "Holder Products" whereby MedPro was to pay royalties on "Net Sales of any Product sold by MedPro or any of its Affiliates." (D.I. 6-2, § 2.3(a)). A separate agreement in 2008 governed a technology transfer of "Wing Products." (D.I. 18-2). On July 15, 2010, MedPro entered into a manufacturing agreement with Grenier Bio-One GmbH, whereby Grenier had the rights, effective October 1, 2010, to manufacture, market and distribute the Holder Products and the Wing Products, in exchange for paying MedPro a royalty. (D.I. 18, p.7, ¶ 6). It appears that the Grenier agreement would guarantee MedPro minimum royalty payments of $43.75 million over the six-year life of the agreement. (*Id.*). In turn, MedPro would pay VCI royalties on MedPro's revenues from the Grenier agreement, pursuant to the two technology transfer agreements. (*Id.*, p.8, ¶ 10).

In September and October 2010, MedPro's wholly owned subsidiary issued notes secured by all amounts due and owing on the Grenier agreement, based on Grenier's sales of Wing and Holder Products. (D.I. 1, ¶¶ 14, 17; D.I. 18, pp. 8-9, ¶¶ 12-13). MedPro received between twenty and thirty million dollars from the loan transaction. (D.I. 18, pp. 8-9, ¶¶ 12-13). VCI sued MedPro (in the Eastern District of Kentucky) for breach of their technology agreements,

2

arguing that MedPro was obligated to pay a six percent royalty on the loan proceeds because MedPro obtained the loan by pledging MedPro's profits off VCI's technology as collateral. (D.I. 1). The case was transferred to this District. MedPro counterclaimed for declaratory judgment that VCI was not due any royalty payment based on MedPro's loan transaction. (D.I. 18).

Both parties seek judgment on the pleadings under FED. R. CIV. P. Rule 12(c). VCI argues that the loan comprises proceeds "actually received" from the "exploitation" of MedPro's products, and therefore comprises a Net Sale under section 1.3 of the agreement. MedPro argues that the loan proceeds are not Net Sales; and that the royalty provision, section 2.3, is not triggered because there was no product actually "sold" in the loan transaction.

## DISCUSSION

### A. Legal Standard

A motion under Rule 12(c) is reviewed under the same standard as a motion to dismiss under Rule 12(b)(6). *See Turbe v. Government of the Virgin Islands*, 938 F.2d 427, 428 (3d Cir.1991). The court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002). "When there are well-ple[d] factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Such a determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id.*

### B. Decision

The parties' requests for judgment on the pleadings require this Court only to interpret the

3

technology agreement as a question of law. The "Holder Products" agreement states that it is to be interpreted under Nevada law. (D.I. 6-2, § 12.8). The "Wing Products" agreement states that is to be interpreted under Delaware law. (D.I. 18-2, § 12.9). The "Wing Products" agreement is not at issue. (D.I. 22, p. 4, D.I. 25, p. 8, n.5).[1]

The "Holder Products" agreement is, in the Court's view, unambiguous, and there are no identified material factual disputes. Therefore, the Court will resolve the issue. *See Shelton v. Shelton*, 78 P.3d 507, 510 (Nev. 2003) ("The question of the interpretation of a contract when the facts are not in dispute is a question of law."); *e.g., Jang v. Boston Sci. Scimed, Inc.*, 817 F.Supp.2d 409, 413 (D. Del. 2011).

Two provisions of the "Holder Products" agreement are relevant here. Section 1.3 of the agreement defines "Net Sales" as:

> the amount actually received by MedPro any Affiliates [sic] from the sale, license, sublicense, lease, franchising, rental or other exploitation of the Products, less: (a) cash, trade, quantity or other discounts, credits or rebates; (b) sales, use, tariff, import/export duties or other excise or similar taxes imposed upon particular sales; (c) transportation and related insurance charges; and (d) allowances or credits to customers because of rejections, returns, refunds, billing errors or retroactive price reductions; all as calculated in accordance with consistently applied and generally accepted accounting principles as used by MedPro in its normal financial reporting.

Section 2.3 discusses "royalty payments." It provides that "MedPro agrees to pay to Visual Connections or its designee a royalty equal to six percent (6%) of Net Sales of any Product sold by MedPro or any of its affiliates."

---

[1] VCI's position appears to be that the "Wing Products" agreement (which has a different description of what triggers the obligation to pay royalties) has not been breached. (D.I. 25, p.8, n.5). Thus, VCI refers to its motion as being for partial judgment on the pleadings, as, if its theory were accepted, there would still be some accounting issues as to what portion of the loan proceeds were attributable to the "Holder Products."

4

The parties dispute the meaning of "other exploitation" in section 1.3. The issue is, does "other exploitation" encompass any productive use or benefit of the products (such as granting to a lender a security interest in a contract to sell the products), or only those uses that create financial profit?

Each term preceding "other exploitation" comprises a revenue-generating activity based on transferring the right to produce or use the product, or units of the product itself. Under the rule of *ejusdem generis*, which means "of the same kind, class, or nature," "other exploitation" must also comprise such a revenue-generating activity. *See Phelps v. State Farm Mut. Auto Ins. Co.*, 917 P.2d 944, 949 (Nev. 1996).

There are other reasons to reject VCI's interpretation. First, the phrase "net sales" is consistent with an interpretation that involves income-generating activities. Common usage does equate borrowing money with making a sale.

Second, the rest of the "Net Sales" definitional provision provides four limitations on when the receipt of monies will not be treated as the "amount actually received" for purposes of calculating the royalty. For example, if a MedPro customer paid $10,000 for some products, and later returned half of the products, and was reimbursed $5,000, it would appear that the royalty would be calculated on the basis of $5,000. *See* Section 1.3(d). Taking the analogy further, if the customer returned all the products, and MedPro returned the entire $10,000, there would be no "amount actually received" for purpose of calculating a royalty payment. Yet VCI argues that if MedPro borrowed $10,000 for three months, secured by the Grenier income stream, and paid the $10,000 back at the end of the three months, it would need to pay VCI $600 in royalties. VCI's interpretation would make no sense. Indeed, under the VCI intepretation, there would be

5

no need to grant a security interest in the Grenier income stream in order to trigger royalty payments. If MedPro offered stock for sale, and issued a contemporaneous press release saying that the company was going to make a lot of money off of the Grenier agreement, under VCI's interpretation, MedPro would have exploited the "Holder Products" and VCI could claim to be entitled to some amount of royalty payments.

Third, there is also the issue of "double-counting." VCI is going to get royalty payments, over time, off of the Grenier income stream. It appears that royalty payments will be based on the minimum amount of $43,750,000. According to VCI's interpretation, there is no logical reason why it would not be entitled to 6% of both the Grenier income and the loan (to the extent they are based on the "Holder Products"). Indeed, according to the VCI interpretation, there is no reason why there could not be "triple-counting" if MedPro paid off the notes early, and then found the need to borrow a second time.

The contract as a whole is clear that it envisions MedPro manufacturing the "Holder products" and distributing them for gain by sale, lease, or any other income-generating means that can be devised, to the benefit of both MedPro and VCI. *See* Section 2.3 of the Agreement. The Grenier transaction furthers that goal. Borrowing $30,000,000 does not.

In sum, the loan transactions did not constitute a "Net Sale" and did not trigger a royalty obligation under the agreement. MedPro's Cross-Motion for Judgment on the Pleadings is granted, and VCI's Motion for Partial Judgment on the Pleadings is denied. An appropriate order will be entered.

6